**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**NICHOLAS G. ZORICH,**

      **Plaintiff,**

 v.                             **Civil Action 2:19-cv-4793
Judge Michael H. Watson
Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Nicholas G. Zorich, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED** and that judgment be entered in favor of Defendant.

### I.   BACKGROUND

#### A.  Prior Proceedings

Plaintiff filed his applications for DIB and SSI on September 28, 2015, alleging disability beginning May 29, 2014, due to Attention Deficit Hyperactivity Disorder ("ADHD"), anxiety disorder, adjustment disorder, scoliosis, deteriorated disc, fibromyalgia, personality disorder, social functioning, and deteriorating vertebrae. (Tr. 267–78, 303). After his applications were denied initially and on reconsideration, an Administrative Law Judge ("ALJ") held a hearing on May 24, 2018. (Tr. 35–97). The ALJ denied benefits in a written decision on August 27, 2018. (Tr. 10– 34). That became the final decision of the Commissioner when the Appeals Council denied review. (Tr. 1–6).

Plaintiff filed this action on October 30, 2019 (Doc. 1), and the Commissioner filed the administrative record on January 21, 2020 (Doc. 7). This matter is now ripe for consideration. (*See* Docs. 10, 11, 12).

**B. Relevant Medical Evidence**

Plaintiff's statement of errors (Doc. 10) pertains to only his mental health, and the Undersigned will, accordingly, focus on the evidence pertaining to the same. The ALJ usefully summarized Plaintiff's mental health symptoms:

> With respect to the claimant's mental functional capacity, and in way of background, the record documents a remote history of drug abuse, poor grades, difficulty establishing appropriate social relationships, and multiple arrests as a juvenile (Exs. 1F and 17F). The remote record also documents diagnoses and treatment for bipolar disorder, attention deficit hyperactivity disorder, polysubstance dependence, and borderline personality disorder (Ex 2F).In November 2015, a clinical mental health counselor indicated that the claimant was seen only in October 2013 (Ex. 4F/3–6), which was prior to his alleged disability onset date, and had diagnoses of attention deficit hyperactivity disorder, anxiety disorder NOS (not otherwise specified), and adjustment disorder (Ex. 4F/10).
>
> In November 2015, psychiatrist Adam Brandemihl, M.D. (Ex. 27F), reported that he had begun treating the claimant in January 2015, well past his alleged disability onset date, and summarized a disheveled appearance, tangential flow of conversation and speech, and an anxious and constricted mood and affect (Ex. 6F /1). Dr. Brandemihl indicated racing thoughts, shortness of breath, excessive worry, panic attacks, poor short-term memory, distractibility, social isolation, and some marijuana use, but full orientation, good fund of knowledge, and normal intelligence (Ex. 6F/l, 2). He indicated diagnoses of mood disorder, anxiety disorder, and attention deficit hyperactivity disorder. Dr. Brandemihl noted that the claimant lived with his girlfriend in an apartment (Ex. 6F/4) and bathed daily with difficulty (Ex. 6F/5).
>
> A November 2015 treatment note revealed that medications were helpful (Ex. 8F/7). Also, in November 2015, during a physical exam, the claimant communicated without difficulty and was in no acute distress (Ex. 5F/2). In December 2015, psychologist Steven Meyer, Ph.D., evaluated the claimant and observed that he had a constricted effect and inconsistent eye contact, was mildly anxious, a little wound up, jumpy, impulsive, irritable, and mildly dysphoric, and looked tired, thin, and pale, but he had driven to the evaluation, arrived on time, and was intelligible, well organized, alert, clear, and fully organized (Ex. 7F). The claimant had no trouble understanding and following simple or moderately

2

complex instructions, and he was able to repeat six digits forward and four backward, quickly add seven serially to 49 without error, recall one out of three words after a five-minute delay, and quickly provide six correct answers on a relationship test. He exhibited adequate concentration, good persistence, and a quick pace on tasks. He acknowledged that he was capable of living independently, making important decisions about his future, and seeking appropriate community resources with assistance. He stated that he did not interact with his neighbors and kept to himself, but he denied having any problems getting along with authority figures, getting along with coworkers or supervisors, or following instructions at work. He reported smoking marijuana daily for his pain. He reported that he was involved in outpatient counseling once or twice a month, but that frequency of treatment is not documented in the record.

In May 2016, Dr. Brandemihl opined that the claimant had various symptoms and signs of affective, anxiety, and personality-related disorders and marked limitations and repeated extended episodes decompensation, consistent with the requirements of listings 12.04, 12.06, and 12.08, and that he would be absent from work more than four days a month (Ex. 9F). In May 2017 and January 2018, Dr. Brandemihl made similar assessments, indicated marked, severe, and extreme mental work-related limitations, and opined that the claimant was fully and permanently disabled (Exs. 12F, 14F–16, and 20F–23F). In a May 2018 letter to the claimant's attorney, Dr. Brandemihl reported that he had seen the claimant since January of 2015, that he continued to see him for medication management and supportive talk therapy, and that he had consistently displayed paranoid thinking, pressured speech, easy distractibility, anxiety, and constricted mood and affect, while also having racing thoughts, excessive worry, panic attacks, pervasive loss of interest in almost all activities, psychomotor agitation, irritability, vigilance, scanning, significant difficulty concentrating, appetite disturbance with a loss in weight, sleep disturbance, decreased energy, deflated self-esteem and feelings of worthlessness (Ex. 26F). Dr. Brandemihl then opined that the claimant had been unable to perform substantial gainful activity since December 2016, and, if he was to work again, would decompensate to the point of needing hospitalization and possibly becoming a danger to himself or others.

(Tr. 21–23).

### C. The ALJ's Decision

In his decision, the ALJ found that Plaintiff met insured status requirements through December 31, 2016, and had engaged in substantial gainful activity from November 1 through December 30, 2016.  As the period of substantial gainful activity at the end of 2016 was relatively brief, the remainder of this decision will address the entire period since his alleged disability onset

3

date of May 29, 2014. (Tr. 15–16). The ALJ found that Plaintiff suffers from the following severe impairments: lumbar scoliosis/strain/sprain, ADHD, and affective, anxiety, and personality-related disorders. (Tr. 16). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 17).

As for Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can frequently climb ramps and stairs, frequently stoop and crouch, and frequently be exposed to extreme cold and vibration, but never climb ladders, ropes, or scaffolds, or be more than frequently exposed to hazards such as dangerous machinery or unprotected heights. He can perform tasks with no fast production pace or strict production quotas, and he can occasionally interact with others.

(Tr. 19).

After thoroughly reviewing the hearing testimony and medical record, the ALJ concluded that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 20).

The ALJ then turned to the opinion evidence. He assigned significant weight to the opinion of the medical expert ("ME") Dr. Michael Lace, noting, among other things, that Dr. Lace had access to the entire record and the opportunity to listen to and question Plaintiff at the hearing, as well as listen to the testimony of Plaintiff's mother. (Tr. 22–23). Next, the ALJ assigned little weight to the assessments of treating psychiatrist, Dr. Richard Brandemihl, finding, among other things, that his "treatment notes were lacking in detail" and that "the record indicates that Dr. Brandemihl saw [Plaintiff] at most once every two months, and only three times in 2016 and once in 2017." (Tr. 24). The ALJ then assigned "some weight" to the assessment of Dr. Steven Meyer, who examined Plaintiff in December 2015, at the request of the Social Security Administration.

4

(*Id*.). The ALJ found that the RFC "appears generally to accommodate the concerns he expressed" but that the record does not document a solitary work environment. (*Id*.). For the same reasons, the ALJ assigned little weight to the opinion of the state agency reviewing psychologists, Kristen Haskins, Psy.D. and Audrey Todd, Ph.D., who opined, in relevant part, that Plaintiff would be expected to be able to respond appropriately in a solitary work setting. (Tr. 24–25).

## II.   STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.  DISCUSSION

Plaintiff's sole assignment of error is multi-faceted. He argues that the ALJ erred in adopting the opinion of the non-examining ME, Dr. Lace, while discounting the opinions of the

5

other medical source opinions of record. Specifically, he argues that the ALJ did not abide by the Social Security Administration's Appeals, Hearings, and Litigation Law Manual ("HALLEX") or the proper analytical hierarchy when weighing the medical source opinions. (*See generally* Doc. 10 at 4–13). The Undersigned considers each argument in turn.

### A. HALLEX

To begin, Plaintiff notes that, while not binding, the ALJ violated the HALLEX by asking the ME, Dr. Lace to opine on Plaintiff's RFC. (Doc. 10 at 6). He asserts that this "represent[s] elements of a larger failure [by the ALJ] to adhere to established standards of judging[.]" (*Id.*). The Undersigned disagrees.

"The HALLEX [ ] says 'an ALJ may not ask an ME to *decide* what a claimant's RFC is, or whether a claimant is or is not disabled." *Hinkle v. Astrue*, No. 2:11-CV-217, 2012 WL 3990724, at *6 (E.D. Tenn. Aug. 28, 2012), *report and recommendation approved*, No. 2:11-CV-217, 2012 WL 3996552 (E.D. Tenn. Sept. 11, 2012) (emphasis in original) (quoting the HALLEX, which is available online at www.ssa.gov/OP–Home/hallex/I–02/I–2–5–39.html)). "The word 'decide' must be given it's common adjudicative meaning, which in this case would be to 'find the fact' or 'make the legal decision.'" *Hinkle*, 2012 WL 3990724, at *6.

At the hearing, the ALJ asked the ME:

Q. For the period in question, residual functional capacity, your opinion?

ME Lace. Yes. Certainly if he were to work full-time, there would be some clear limitations. He would, first of all, be limited to occasional contact with coworkers, the general public as well as supervisors, and would also be limited to no fast paced, high production quota type work as one would find perhaps on a high speed production line setting. And those would be the only significant limitations, and that second limitation would be due largely to anxiety management issues.

(Tr. 77).

In his written opinion, with regard to Plaintiff's non-exertional limitations, the ALJ

6

concluded:

> In summary, the record documents mental health diagnoses and reports of significant related symptomatology that is aggravated by intense interpersonal contacts and high stress. Accordingly, the claimant is limited to tasks with no fast production pace or strict production quotas, and no more than occasional interaction with others.

(Tr. 22).

In reaching this conclusion, the ALJ credited the assessment of Dr. Lace. (*See* Tr. 22–23). But Dr. Lace did not decide Plaintiff's RFC. Rather, Dr. Lace "opined on [his] [non]-exertional limitations, based upon the evidence in the record." *Hinkle*, 2012 WL 3990724, at *6. And the ALJ adopted Dr. Lace's non-exertional limitations for the mental health RFC. *See id*. At base, it was the ALJ—not the ME—who decided Plaintiff's non-exertional workplace limitations. *See id*. (holding that the ALJ did not "decide" and, consequently, did not violate the HALLEX by adopting ME's exertional limitations and incorporating them into the RFC).

And, as explained below, the ALJ set forth good reasons for his decision to afford greater weight to Dr. Lace's opinion than the other medical source opinions of record.

### B. Hierarchy of Medical Opinions

Plaintiff correctly notes that, in social security cases like this one that arose prior to March 27, 2017, there is a hierarchy of medical opinions, and ALJs should weigh the opinion evidence accordingly. (Doc. 10 at 6 (citing 20 C.F.R. § 404.1527)). It appears that the crux of Plaintiff's argument is that the ALJ improperly adopted the opinion of Dr. Lace, who did not examine Plaintiff, while largely discounting the opinions of the other medical sources in the record. As discussed below, Plaintiff's argument falls short.

#### 1. *Medical Expert Dr. Lace*

As noted, Plaintiff asserts that the ALJ erred in affording greater weight to Dr. Lace's opinion than to that of his treating psychiatrist Dr. Brandemihl. While a treating physician's opinion

7

is generally "entitled to weight substantially greater than that of a non-examining medical advisor," *Fuston v. Comm'r of Soc. Sec.*, No. 1:11-CV-224, 2012 WL 1413097, at *6 (S.D. Ohio Apr. 23, 2012), *report and recommendation adopted*, No. 1:11CV224, 2012 WL 1831578 (S.D. Ohio May 18, 2012), "[i]n appropriate circumstances," opinions from non-examining sources, like a ME, "may be entitled to greater weight than the opinions of treating or examining sources," *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009).

For example, "'[a] non-examining physician's opinion,'" like that from an ME, "'may be accepted over that of an examining physician when the non-examining physician clearly states the reasons that his opinions differ from those of the examining physicians.'" *Fuston*, 2012 WL 1413097, at *10 (quoting *Lyons v. Soc. Sec. Admin.*, 19 F. App'x 294, 302 (6th Cir. 2001)) (citing *Barker*, 40 F.3d at 794 (holding that ALJ was entitled to accept non-examining medical advisor's opinion where the medical advisor explained his position by reference to the objective medical and psychological reports for the plaintiff's file, as well as the undisputed facts concerning the plaintiff's prior work and social history)).  Moreover, "an ALJ's acceptance of an ME's opinion over the opinion of an examining or treating physician can be appropriate, especially when the medical expert has access to a claimant's entire medical record." *Compton v. Astrue*, No. 1:11-CV-626, 2012 WL 4473155, at *8 (S.D. Ohio Sept. 26, 2012), *report and recommendation adopted sub nom. Compton v. Comm'r of Soc. Sec.*, No. 1:11-CV-626, 2012 WL 5288003 (S.D. Ohio Oct. 25, 2012) (citing *Barker*, 40 F.3d at 794).

Here, the ALJ did not err in adopting the opinion of Dr. Lace over that of Plaintiff's treating psychiatrist. To begin, as the ALJ noted in his written opinion (*see* Tr. 22–23), Dr. Lace had access to Plaintiff's entire medical record, listened to the testimony of Plaintiff and his mother, questioned Plaintiff, and summarized the record of evidence. *See Compton*, 2012 WL 4473155, at *8 (noting

8

that "an ALJ's acceptance of an ME's opinion over the opinion of an examining or treating physician can be appropriate, especially when the medical expert has access to a claimant's entire medical record").

Moreover, Dr. Lace clearly explained why his opinion differed from that of Plaintiff's treating psychiatrist. *See Fuston*, 2012 WL 1413097, at *10 (quotation marks omitted) (noting that a ME's opinion "may be accepted over that of an examining physician when [the ME] clearly states the reasons that his opinions differ from those of the examining physicians"). He began by noting his perceived weaknesses of Dr. Brandemihl's opinion. For example, Dr. Lace noted it was difficult to assess the severity of Plaintiff's conditions because Plaintiff saw Dr. Brandemihl for medication management, rather than psychotherapy, and not as frequently as Plaintiff testified. (Tr. 73–74). Further, Dr. Lace noted that Dr. Brandemihl "almost uniformly" failed to complete a mental status exam at his appointments with Plaintiff and that his assessment plan consisted simply of continued medication. (Tr. 74). Relatedly, Dr. Lace explained that Dr. Brandemihl's notes "are completely devoid of therapeutic goals or methods or modalities that are being used if it were psychotherapy." (*Id*.).

So Dr. Lace conducted his own review of the hearing testimony and mental health evidence. And he opined that Dr. Brandemihl's extreme limitations are not supported by the record. Specifically, he explained that someone with the "extreme and marked limitations" proposed by Dr. Brandemihl "certainly wouldn't be able to work part-time," which Plaintiff did in December 2016. (Tr. 75). Nor would he "have any ongoing relationships at all, including a relationship with a girlfriend." (*Id*.). Additionally, Dr. Lace noted that Plaintiff "[w]ould likely be hospitalized very frequently if [he] had extreme limitations in really any of these areas." (*Id*.).

Instead, Dr. Lace opined that Plaintiff has "mild" limitations in his ability to understand,

9

remember or apply information. (Tr. 76). As for Plaintiff's ability to interact with others, Dr. Lace "g[ave] some credence to the notes by the treating physician that consistently or at least fairly consistently described some social limitations, and . . . references to anxiety and depression" and concluded that Plaintiff would have a "moderate" difficulties. (Tr. 75–76). He also opined that Plaintiff would have "moderate" difficulties in his ability to concentrate, persist or maintain pace but only "mild" difficulties in his ability to adapt or manage himself. (Tr. 77). In sum, based on his review of the record, Dr. Lace opined that Plaintiff could occasionally interact with coworkers, supervisors, and the public, and work in settings without a fast pace or high production quota. (*Id*.).

Relying on Dr. Lace's testimony and his view of the record, the ALJ concluded that "the record documents mental health diagnoses and reports of significant related symptomatology that is aggravated by intense interpersonal contacts and high stress." (Tr. 22). Accordingly, the ALJ limited Plaintiff to tasks with no fast production pace or strict production quotas, and no more than occasional interaction with others. (*Id*.). Plaintiff has not shown that the ALJ erred in how he weighed Dr. Lace's opinion.

As for Plaintiff's concern that the ALJ mistakenly noted that Dr. Lace is "Board certified in psychology" when, instead, he has a "master's degree and doctor of psychology degree in clinical psychology from the now-defunct Forest Institute of Professional Psychology," (Doc. 10 at 11), it is, at best, harmless error. Plaintiff contends that "[i]t is impossible to know the extent to which this mistake of fact influenced the ALJ in crediting the testimony of Dr. Lace, and whether a different result would have made sense if the ALJ was viewing the record as it was, rather than as imagined." (*Id*. at 11–12). But, despite mistakenly noting that Dr. Lace is "Board certified in psychology," the ALJ also listed other record-based reasons for adopting the opinion of Dr. Lace. In addition to the reasons described above, the ALJ considered the fact that Dr. Lace "listened to

10

the testimony of [Plaintiff] and his mother, questioned [Plaintiff]," had "training and experience in reviewing an objective record and formulating an opinion as to medical severity," offered an opinion "consistent with and supported by the above-summarized record," and, "[a]s an expert witness before the [SSA], has knowledge of the SSA program and had access to the medical evidence on record when he offered his opinion (Tr. 22–23). Plaintiff has not shown that remand is necessary for the ALJ to correct a single mistake with regard to Dr. Lace's credentials.

In sum, Plaintiff has not shown that the ALJ erred in relying on the opinion of Dr. Lace over that of his treating psychiatrist. *See, e.g.*, *Estrada v. Comm'r of Soc. Sec.*, No. 2:18-CV-960, 2019 WL 3228899, at *5 (S.D. Ohio July 18, 2019), *report and recommendation adopted sub nom. Estrada v. Comm'r of Soc. Sec.*, No. 2:18-CV-960, 2019 WL 3976354 (S.D. Ohio Aug. 22, 2019) (noting that ME had access to the entire record and "[c]onsequently, "it was not improper for the ALJ to find [ME's] opinion more useful than the consultative examiners' and state agency reviewers' opinions"); *Williams v. Colvin*, No. 1:15CV00829, 2016 WL 1408621, at *20 (N.D. Ohio Apr. 11, 2016) (holding that the ALJ did not err in affording greater weight to ME's opinion and discounting other medical opinions because ME had the opportunity to review Plaintiff's entire record and because his opinion was consistent with the record); *Bray v. Comm'r of Soc. Sec.*, No. 1:13-CV-40, 2013 WL 5979987, at *6 (S.D. Ohio Nov. 12, 2013), *report and recommendation adopted*, No. 1:13-CV-00040, 2014 WL 4377771 (S.D. Ohio Sept. 3, 2014) (quotation marks and citation omitted) (holding that ALJ did not err in giving greater weight to ME where ME "had the ability to evaluate all of [p]laintiff's medical records, and to observe first-hand [p]laintiff's testimony and that of [p]laintiff's sister" and, therefore, "had a superior longitudinal perspective of [plaintiff's] mental condition, despite not having personally examined [plaintiff]." *Werner v. Comm'r of Soc. Sec.*, No. 1:12-CV-143, 2013 WL 1137502, at *6 (N.D. Ohio Mar. 18, 2013) ("In

11

this case, it was reasonable for the ALJ to discount these doctors' opinions in favor of the ME's conclusions given that the ME was able to observe [plaintiff] during the hearing and had the benefit of reviewing [plaintiff's] entire medical record."); *Stankoski v. Comm'r of Soc. Sec.*, No. 2:11-CV-00627, 2012 WL 2563939, at *12 (S.D. Ohio June 29, 2012), *report and recommendation adopted*, No. 2:11-CV-00627, 2012 WL 3780333 (S.D. Ohio Aug. 31, 2012), *aff'd sub nom. Stankoski v. Astrue*, 532 F. App'x 614 (6th Cir. 2013) (holding that "the ALJ was justified in favoring and crediting the opinions of the medical experts" where medical experts "gave detailed opinions regarding [p]laintiff's functional abilities based on their review of the entire record," where ME's opinion was consistent with the record, and where none of plaintiff's physicians "gave detailed accounts of [his] mental or physical functional abilities").

### 2. Treating Psychiatrist Dr. Brandemihl

Plaintiff also appears to argue that the ALJ failed to properly apply the treating physician rule when considering Dr. Brandemihl's opinion. (Doc. 10 at 6–14). Plaintiff is mistaken.

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id*. The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "'the good reasons rule,' which 'require[s] the ALJ to always give good reasons ... for the weight given to the claimant's treating source opinion.'" *Dixon*, 2016 WL

860695, at *4 (alterations in original) (quoting *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)); 20 C.F.R. § 404.1527(c)(2). To meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). Specifically, if an ALJ:

> declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source."

*Fletcher v. Comm'r of Soc. Sec.*, 9 F. Supp. 3d 817, 828 (S.D. Ohio 2014) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. § 406.1527(c)(2)–(6) (setting forth the relevant factors). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Here the ALJ satisfied both steps. First, he recognized that, under the treating physician rule, treating physicians' opinions are generally afforded deference. (Tr. 23). But he correctly noted that a treating physician "is not so entitled if it is not well-supported by medically acceptable clinical or laboratory diagnostic techniques and is inconsistent with other substantial evidence of record." (Tr. 23–24). He went on to set forth good reasons for discounting Dr. Brandemihl's opinion. First, he noted that "[t]he treatment record from Dr. Brandemihl consists of his handwritten, frequently illegible, comments, including noting prescribed medications, but no, or incomplete, mental status exam findings. (Tr. 22). Next, the ALJ noted that "the record indicates that Dr. Brandemihl saw [Plaintiff] at most once every month, and only three times in 2016 and once in 2017." (Tr. 24). Further, the ALJ noted that "[t]here is no documentation of hospitalization

or extended episodes of decompensation despite Dr. Brandemihl's indication to the contrary." (*Id.*). Additionally, the ALJ noted that Plaintiff's "actual level of functioning, which has included work activity, a long-term relationship, and independent activities of living, including after some of the above assessments of Dr. Brandemihl, is also inconsistent with such marked and extreme limitations." (*Id.*). Finally, the ALJ noted that while "Dr. Brandemihl indicated that [Plaintiff] worked only part-time in December 2016 and under close supervision[,]. . . as summarized above, the work activity was substantially gainful and [Plaintiff] testified that it ended because his employer ran out of work not due to any disability, though his mother testified otherwise." (*Id.*).

The foregoing establishes that, despite Plaintiff's argument to the contrary, the ALJ balanced the relevant regulatory factors, including the length, frequency, nature, and extent of the treatment relationship, the supportability of the opinion, and the consistency of the opinion with the record as a whole. *Fletcher*, 9 F. Supp. 3d at 828. While the ALJ did not explicitly discuss Dr. Brandemihl's specialty, he noted that Dr. Brandemihl primarily saw Plaintiff for medication management rather than psychotherapy and did not complete thorough mental status exams, which would have supported the extreme workplace limitations set forth in his opinion. (Tr. 22). In any event, the regulatory requirements do not mandate "an exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011).

At base, the ALJ properly applied the two-step analysis when considering the opinion of Plaintiff's treating psychiatrist, and Plaintiff has failed to show that the ALJ committed reversible error.

### 3. *Non-Treating Source Opinions*

Finally, Plaintiff asserts that the ALJ erred in not adopting a specific limitation posed by one-time examining psychiatrist Dr. Steven Meyer and state agency reviewing mental consultants.

14

These consultants opined that Plaintiff would be able to respond appropriately in a solitary work environment. (Doc. 10 at 8–9). Plaintiff emphasizes that, at his hearing, the Vocational Expert ("VE") opined that a solitary work environment would be work-preclusive, and therefore, had the ALJ properly weighed these opinions, the ALJ would have reached a different decision. (*See generally id.*). Again, Plaintiff has failed to convince the Undersigned.

As for Dr. Meyer's opinion, the ALJ gave "some weight" to his opinion and found "that the above-identified RFC appears to generally accommodate the concerns he expressed." (Tr. 24). But the ALJ expressly declined to adopt Dr. Myer's additional workplace limitations. (*Id.*). The ALJ explained,

> I do not find that the record documents the need for a structured work setting, solitary work environment, or additional assistance within the context of only occasional contact with others and no fast production pace or strict production quotas. Rather, I note that Dr. Meyer summarized that the claimant denied having any problems getting along with authority figures, getting along with coworkers or supervisors, or following instructions at work, and had acknowledged that he was capable of living independently and making important decisions about his future.

(*Id.*). For "the same reasons," the ALJ afforded "little weight" to the state agency consultants' opinion that Plaintiff would be expected to be able to respond appropriately in a solitary work setting with occasional or intermittent interactions with coworkers and supervisors. (Tr. 24–25).

Apart from arguing, generally, that the ALJ improperly weighed the opinion evidence, Plaintiff has not shown that the ALJ erred in declining to adopt this limitation. Indeed, it is the ALJ, not a medical source, who ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B). This is because "[a]n RFC determination is a legal decision rather than a medical one, and the development of a claimant's RFC is solely within the province of an ALJ." 20 C.F.R. § 404.1527(3).

At bottom, the ALJ relied on the evidence as a whole and appropriately tailored the RFC to

15

accommodate Plaintiff's social and mental health limitations. While Plaintiff may disagree with these accommodations, he has not shown the ALJ acted outside of his permissible "zone of choice" that grants the ALJ discretion to make findings without "interference by courts." *Blakely*, 581 F.3d at 406.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

16

Date:   July 8, 2020                    /s/ Kimberly A. Jolson
                                                  KIMBERLY A. JOLSON
                                                  UNITED STATES MAGISTRATE JUDGE